AO 91 (Rev. 11/11) Criminal Complaint           AUSA Ann Marie Ursini (312) 697-4092

**FILED**
2/9/2022
THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

UNITED STATES OF AMERICA

v.

MITCH MOHDI

CASE NUMBER: 1:22-cr-00078

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

### Count One

*Code Section*

Title 21, United States Code, Section 846(a)(1)

*Offense Description*

On or about January 25, 2022, at Chicago, in the Northern District of Illinois, Eastern Division, MITCH MOHDI did knowingly and intentionally distribute a controlled substance, namely a mixture and substance containing a detectable amount of fentanyl, a Schedule II Narcotic Drug Controlled Substance, in violation of Title 21, United States Code, Section 841(a)(1).

### Count Two

*Code Section*

Title 21, United States Code, Section 841(a)(1) and Title 18, United States Code, Section 2

*Offense Description*

On or about February 8, 2022, at Palos Park, in the Northern District of Illinois, Eastern Division, MITCH MOHDI did knowingly and intentionally distribute a controlled substance, namely 40 grams or more of a mixture and substance containing a detectable amount of fentanyl, a Schedule II Narcotic Drug Controlled Substance, in violation of Title 21, United States Code, Section 841(a)(1) and Title 18, United States Code, Section 2.

This criminal complaint is based upon these facts:

 X  Continued on the attached sheet.

CHRISTOPHER WHARRAM
Digitally signed by CHRISTOPHER WHARRAM
Date: 2022.02.09 10:49:12 -06'00'

CHRISTOPHER WHARRAM
Special Agent,
Drug Enforcement Administration (DEA)

Pursuant to Fed. R. Crim. P. 4.1, this Complaint is presented by reliable electronic means. The above-named agent provided a sworn statement attesting to the truth of the Complaint and Affidavit by telephone.

Date: <u>February 9, 2022</u>

_Judge's signature_

City and state: <u>Chicago, Illinois</u>

<u>BETH W. JANTZ, U.S. Magistrate Judge</u>

_Printed name and title_

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

## **AFFIDAVIT**

I, CHRISTOPHER WHARRAM, being duly sworn, state as follows:

1.      I am a Special Agent with the Drug Enforcement Administration (DEA) and have been so employed since October 2019.  I am currently assigned to the DEA Chicago Field Division, and my responsibilities include the investigation of narcotics trafficking offenses.   I have also been involved in various types of electronic surveillance, and in the debriefing of defendants, witnesses, informants, and others who have knowledge of narcotics trafficking.  I have also received specialized training in the enforcement of laws concerning the activities of narcotics traffickers. I have received training and personally participated in investigations targeting the sale of illegal drugs on the dark web and the use of Bitcoin.

2.      This affidavit is submitted in support of a criminal complaint charging MITCH MOHDI with distributing a controlled substance, namely a mixture of a substance containing a detectable amount of fentanyl, a Schedule II Narcotic Drug Controlled Substance, in violation of Title 21, United States Code, Section 841(a)(1) (Count One); and distributing a controlled substance, namely 40 grams or more of a mixture and substance containing a detectable amount of fentanyl, in violation of Title 21, United States Code, Section 841(a)(1) and Title 18, United States Code, Section 2 (Count Two).

3.    Because this affidavit is being submitted for the limited purpose of establishing probable cause in support of a criminal complaint charging MOHDI with distributing a controlled substance, I have not included each and every fact known to me concerning this investigation.  I have set forth only the facts that I believe are necessary to establish probable cause to believe that the defendant committed the offense alleged in the complaint.

4.    This affidavit is based on my personal knowledge, information provided to me by other law enforcement agents, information provided by a confidential source, review of consensually recorded conversations, review of public records databases, and my training and experience as well as the training and experience of other law enforcement agents.

5.    The investigation included the use of consensually recorded phone calls, meetings, and the exchange of text messages. The summaries of recorded conversations and text message exchanges in this affidavit do not include reference to all of the topics covered during the conversations.  Further, quoted material from the recorded conversations as set out in this affidavit is taken from draft summaries, not final transcripts.  In addition, the summaries do not include references to all statements made by the speakers on the topics that are described by the speakers. In certain of the paragraphs describing calls set forth below, interpretations of the discussion are included in brackets. These interpretations include meanings attributed to code words, coded language, or vague references used by the speakers. My understanding and interpretation of the conversations is based upon the contents

of the conversations, information provided by the confidential source, the context of both prior and subsequent intercepted conversations, my knowledge derived from this investigation, and my experience and familiarity, and the experience and familiarity of other law enforcement agents, with narcotics trafficking.

## I.    SUMMARY

6.     As set forth further in more detail below, MOHDI arranged two sales of fentanyl to an undercover law enforcement officer ("UCE") and an individual who, unbeknownst to MOHDI, was a confidential source working with the DEA (the "CS'). First, MOHDI arranged for the January 25, 2022, sale of approximately 8.5 grams of fentanyl from Individual A to the UCE and CS; MOHDI personally delivered the fentanyl to the UCE.  Second, MOHDI arranged for the February 8, 2022, sale of approximately 42.5 grams of fentanyl from Individual B to the UCE and CS; MOHDI arranged the price of the deal, set up the deal location, and took the buy money from the UCE.  MOHDI was placed in custody, and agents found 147 grams of a mixture and substance containing methamphetamine on his person.

## II.    FACTS SUPPORTING PROBABLE CAUSE

### a. The Confidential Source ("CS")

7.     The CS has been a confidential source for law enforcement, specifically for the Niles Police Department, since June 2019.  The CS has been involved in two investigations as a CS, including the present investigation and an unrelated investigation in 2019.   In 2019, the CS was encountered by law enforcement possessing a user amount of cocaine. During his interaction with Niles Police in

relation to that encounter, the CS offered to and did become a CS. He was not criminally charged in relation to the cocaine possession. The CS was not paid for the CS's activity as a CS in that investigation. In January 2022, the CS reached out to a DEA Task Force Officer involved in the current investigation, and whom the CS knew from his work as a CS in 2019. The CS called the Task Force Officer to relate that the CS had been arrested for driving under the influence, and he offered to share information with law enforcement about narcotics trafficking. The CS was not made any promises with regard to the arrest, which is still pending. The CS was informed that any assistance provided to law enforcement would not benefit him in relation to the arrest, but that he could be financially compensated. To date, the CS has not received payments in relation to the CS's assistance in this investigation. The CS's criminal history includes arrests for a DUI and a battery, but no convictions.

8.     According to the CS, he was connected with MOHDI through a mutual acquaintance, whom the CS knew from his work. According to the CS, the CS's acquaintance worked with MOHDI to distribute narcotics, and the CS has had narcotic transactions with him in the past. CS identified MOHDI's booking photo from a past arrest. CS knew MOHDI's real name and was connected with him via social media.

9.     The CS informed law enforcement that MOHDI's cell phone number was (312) XXX-4748 (the "Mohdi Phone[1]").

---

[1] This number was identified as belonging to MOHDI based on the following: First, the CS identified this as MOHDI's phone number. Second, as set forth below, MOHDI used this number to arrange meetings on January 25, 2022 and February 8, 2022, at which MOHDI

4

      **b. January 25, 2022: MOHDI Distributed Approximately 8.5 Grams of Fentanyl to the UCE.**

10.     According to the CS, between on about January 23, 2022 and January 25, 2022, the CS exchanged calls and text messages with MOHDI, who was using the Mohdi Phone. During these communications, MOHDI agreed to sell "blues" [fentanyl pills] to the UCE, who the CS represented as a coworker. The CS and MOHDI agreed that the UCE would purchase 100 pills for $1,200. The CS and MOHDI agreed to meet at near 2002 North Halsted in Chicago, Illinois on January 25, 2022.

11.     On or about January 25, 2022, at approximately 11:32 a.m., the CS and the UCE traveled to the prearranged location together in the CS's vehicle. Prior to the meeting, law enforcement provided the UCE with $1,200 of buy money and equipped the UCE and the vehicle with concealed audio and recording devices.

12.     At approximately 11:38 a.m., at the prearranged location, MOHDI got into the CS's vehicle with the CS and the UCE. From there, CS, UCE, and MOHDI traveled in one car to 3850 West Lake Street in Chicago, near a CTA stop, to meet MOHDI's associate, Individual A.

13.     According to the UCE, during the drive from North Halsted to West Lake Street, MOHDI spoke to the UCE and CS, and also made calls to unknown persons using on his cellphone. His statements in the car, including his side of the calls he made while in the vehicle, were captured on audio recording. In the

---

appeared in person. During the February 8, 2022 meet, MOHDI was observed by UCE utilizing his phone at the same time the CS received a call from MOHDI directing them where to park for the meeting.

statements, MOHDI discussed procuring and selling controlled substances. For example:

    a.    At approximately 11:50 a.m., MOHDI made a phone call and asked, "how much are you selling a ball [3.5 grams of cocaine] for?" MOHDI then requested "1 ball," "a 10 pack" of Viagra, "45 orange [Adderall pills]" and "100 blues." Based on my training and experience, "blues" refers to Oxycontin or pills printed to look like Oxycontin.[2]

    b.    At approximately 11:53 a.m., MOHDI made another call, in which he asked about "whites and blues." MOHDI then spoke to the UCE and the CS and asked if they wanted to purchase 50 fifteen milligram Oxycontin pills or 140 "M367" [hydrocodone]. The UCE declined, stating that the UCE only had the previously agreed upon amount of $ 1,200 in cash with him.

    c.    At approximately 11:57 a.m., MOHDI stated he had a contact who had a large quantity of "meth" [methamphetamine] and could sell it to the CS and UCE for "$350 an ounce."

    d.    At approximately 12:01 p.m., MOHDI made another call, in which he discussed "100 green and 100 yellow [narcotic pills]."

14.    According to the UCE, during the car ride, MOHDI asked the UCE whether the purchase was for the UCE's personal use or if the UCE was a seller. The UCE said he would sell what he purchased and asked MOHDI about how to get in

---

[2] Oxycontin is a brand name for oxycodone, which is a Schedule II controlled substance.

touch with MOHDI going forward. MOHDI instructed the UCE to go through the CS to contact MOHDI.

15.     According to the UCE, when CS, UCE and MOHDI arrived at 3850 West Lake Street, they met Individual A.  Individual A got into the CS vehicle and produced an open chip bag and handed the bag to MOHDI.  UCE handed $1,200 in cash to Individual A.  MOHDI then handed the chip bag to the UCE.  After the exchange had been made, Individual A and MOHDI got out of the vehicle, and the UCE and CS left together in the CS's vehicle and drove to a DEA meeting location.

16.     Law enforcement reviewed the contents of the chip bag handed to UCE by MOHDI and provided by Individual A.  Inside the chip bag was a clear plastic bag containing approximately 100 blue pills.

17.     DEA conducted a field test on one of the pills, which tested positive for the presence of fentanyl. The process of field testing destroyed the single pill tested. DEA weighed the pills and plastic bag; together they weighed approximately 11 grams.[3] DEA weighed an empty plastic bag that was similar but larger, and found it to weigh 2.5 grams. Therefore, the pills without the bag weighed approximately 8.5 grams. A forensic chemist at DEA's North Central Lab tested the remaining 99 pills and found that they contained fentanyl.

---

[3] Due to the potency of fentanyl and the potential danger of handling fentanyl directly, DEA protocol does not permit the removal of the fentanyl pills for weighing until the pills are in a laboratory setting.

   **c. February 8, 2022: MOHDI and Individual B Distributed Over 40 Grams of Fentanyl to the UCE.**

18.  According to the CS, between on or about February 4, 2022, and February 8, 2022, the CS exchanged calls and text messages with MOHDI, who was using the Mohdi phone, to arrange another sale of "blues." During these conversations, the CS and MOHDI arranged the sale of 400 fentanyl pills for $4,800.

   a.  On Sunday, February 6, 2022, the following text conversation took place:

| | |
|---|---|
| CS: | Where am I scooping you Tuesday |
| MOHDI: | It will probably be south |
| | But we ready |
| CS: | Just send and address so I can know exactly how long I'll be Need to let work know when I'll be in |
| MOHDI: | Idk [I don't know] will talk Monday night |

   **[. . .]**

| | |
|---|---|
| MOHDI: | I will have the 400 [pills] Tuesday just give me a call |
| CS: | Ok where we meeting |
| | Or do we have to go pick them up |
| MOHDI: | Same thing meet me first |
| CS: | Ok just send me the address |
| | Then we're going to the  […] cta? |
| MOHDI: | My guy will meet us no not him [indicating they will meet someone other than Individual A, who the CS and the UCE met near a CTA station] |

   b.  On Monday, February 7, 2022, the following text conversation took place:

| | |
|---|---|
| MOHDI: | Still on for tomorrow? |
| CS: | Ya 100% |

19.     On February 8, 2022, at approximately noon, the UCE and CS drove the CS's car to the parking lot of a grocery store at 9652 West 131st Street in Palos Park, Illinois.  According to the CS, this was the location the CS and MOHDI arranged for the meeting.  Prior to the meeting, law enforcement provided the UCE with $4,800 of buy money[4] and equipped the UCE and the CS's vehicle with concealed audio and video recording devices.

20.     According to the UCE, when the CS and UCE arrived at the parking lot, UCE observed MOHDI and Individual B standing near a car.  As the UCE and CS pulled into the parking lot, the CS received a phone call from the Mohdi number.  While the CS was on the phone, the UCE was able to see MOHDI holding a phone.

21.     According to the UCE, the UCE and CS parked, and MOHDI and Individual B got into the CS's car.  After MOHDI and Individual B got into the car, MOHDI asked the UCE for the money.  UCE handed MOHDI $4,800 in cash.  MOHDI counted the money, handed a portion to Individual B and kept a portion to himself.  While MOHDI was counting the money, Individual B produced a clear plastic bag from his front pocket, containing numerous blue pills, and handed the bag to the UCE.

---

[4] As discussed further below, DEA maintained a record of the serial number of the bills used as buy money.  These serial numbers were later compared to bills totaling $1,600 in cash recovered from MOHDI's vehicle, and DEA confirmed the cash found in the vehicle was a portion of the buy money used on February 8, 2022.

22.    The pills appeared similar in size, shape, and color to the pills the UCE obtained from Individual A in January 2022.

23.    After the transaction, Individual B and MOHDI got out of the CS's car and walked to separate cars in the lot.  As MOHDI was entering his car, law enforcement activated sirens and announced their presence, and MOHDI was taken into custody.

24.    DEA field tested one of the pills, which was positive for the presence of fentanyl.  The process of field testing destroyed the single pill tested.

25.    DEA weighed the remaining 399 pills in the plastic bag. The pills and bag weighed 45 grams. For comparison, DEA weighed an empty plastic bag, similar in style but larger than the bag containing the pills. The empty bag weighed approximately 2.5 grams.  Therefore, I believe the bag contained approximately 42.5 grams of pills containing fentanyl.

### d. MOHDI's Arrest and Possession of a Distribution Amount of Methamphetamine

26.    As described above, on February 8, 2022, law enforcement took MOHDI into custody.  MOHDI was arrested near a vehicle, with the door open, and cash visible in the center console.  Law enforcement officers retrieved $1,600 in cash from the center console of the vehicle that MOHDI was entering, and confirmed through serial numbers that the cash was from the buy money used by the UCE.  Law enforcement also conducted a search of MOHDI pursuant to arrest, and recovered a black plastic bag containing multiple clear plastic knotted bags in MOHDI's pocket. Law enforcement reviewed the contents of the baggie, which contained approximately

147 grams of a crystal-like substance. DEA conducted a field test of the substance, which tested positive for methamphetamine.

## III. CONCLUSION

27. Based on the above, I submit that there is probable cause to believe that on or about January 25, 2022, MITCH MOHDI knowingly and intentionally distributed a controlled substance, namely a mixture and substance containing a detectable amount of fentanyl, a Schedule II Controlled Substance, in in violation of Title 21, United States Code, Section 841(a)(1).

28. Additionally, based on the above, I submit that there is probable cause to believe that on or about February 8, 2022, MITCH MOHDI knowingly and intentionally distributed a controlled substance, namely 40 grams or more of a mixture and substance containing a detectable amount of fentanyl, a Schedule II Controlled Substance, in in violation of Title 21, United States Code, Section 841(a)(1) and Title 18, United States Code, Section 2.

FURTHER AFFIANT SAYETH NOT.

CHRISTOPHER WHARRAM
Digitally signed by CHRISTOPHER WHARRAM
Date: 2022.02.09 10:22:20 -06'00'

CHRISTOPHER WHARRAM
Special Agent
Drug Enforcement Administration

SWORN TO AND AFFIRMED by telephone February 9, 2022.

Honorable BETH W. JANTZ
United States Magistrate Judge